1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

                    Plaintiff,

    vs.                          CRIMINAL ACTION NO. 1:15-CR-19

PATRICK W. GANIM,

                    Defendant.

                              - - -

    Proceedings had in the Plea Hearing of the above-styled

action on June 8, 2015, before the Honorable John S. Kaull,

Magistrate Judge, at Clarksburg, West Virginia.

APPEARANCES:

FOR THE PLAINTIFF:    SARAH WAGNER MONTORO, ESQUIRE
                      Assistant United States Attorney
                      320 W. Pike Street - Suite 300
                      Clarksburg, West Virginia   26301
                      304-623-7030

FOR THE DEFENDANT:    L. RICHARD WALKER, ESQUIRE
                      Federal Public Defender Office
                      The Huntington Bank Building
                      230 W. Pike Street - Suite 360
                      Clarksburg, West Virginia   26302
                      304-622-3823

The Defendant was present in person.

Proceedings recorded utilizing digital recording, transcript
produced by computer-aided transcription.

_____

**LINDA L. BACHMAN, CCR, CVR**
**U.S. COURT REPORTER**
**P.O. BOX 969**
**CLARKSBURG, WEST VIRGINIA   26302-0969**
**(304) 282-0395**

2

**I N D E X**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (For the Government) | | | | |
| George Sinclair | 44 | 48 | | |

Defendant Sworn - Page 3

1                    P R O C E E D I N G S

2          (06-08-2015, 1:00 o'clock p.m., defendant present)

3              THE COURT:  All right.  Let's go on the record

4      please.

5              THE CLERK:  United States of America versus Patrick

6      Ganim, Case Number 1:15-CR-19.  The defendant is present in

7      person.  This matter comes on for a plea hearing.  Will

8      counsel please note their appearance for the record?

9              MS. MONTORO:  Sarah Montoro on behalf of the

10     Government.

11             MR. WALKER:  I'm Richard Walker on behalf of Mr.

12     Ganim.

13             THE COURT:  Mr. Ganim, would you please stand in

14     your place, raise your right hand and be sworn, sir?

15         (Defendant Standing)

16         (The defendant was sworn.)

17             THE CLERK:  You may be seated.

18         (Defendant Seated)

19             THE COURT:  Mr. Ganim, pull the microphone over to

20     you.  Ms. Montoro, is--has the appropriate notice been given

21     to any potential victims in this matter?

22             MS. MONTORO:  Yes, Your Honor.

23             THE COURT:  All right.  Mr. Ganim, you're appearing

24     before the Court today.  I'm going to ask you some

25     questions.  If there's any question that I ask you that you

4

1    don't understand for a reason I want you to tell me in

2    advance of trying to answer it that you don't understand it.

3    If you answer a question that I ask you, I'm going to assume

4    that you understood the question.  You certainly have a

5    right to ask any questions that you want at any time during

6    today's hearing.  You're encouraged to do that.

7         You're also encouraged to talk with your attorney at any

8    time that you want to.  You have a right to privacy when you

9    do talk with your attorney.  Please understand that the

10   microphone in front of you is recording and is broadcasting

11   what you are saying so if you're unable to have privacy

12   there at counsel table by muting the microphone and talking

13   softly, let me know; we'll take a recess.  After you've had

14   a chance to talk with your attorney in private then we'll

15   resume the proceedings.

16        Do you understand all those instructions?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  As I've indicated, you're under oath

19   and you're required to give truthful answers to the

20   questions you're asked.  If you would give false testimony

21   in response to any question that's material to this

22   proceeding, then you could subject yourself to fine,

23   imprisonment or both for contempt of court, perjury or false

24   swearing while under oath.  That penalty would be in

25   addition to any penalty that you may face by your proposed

1    plea of guilty.  Do you understand that?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  I want to tell you in advance that I've

4    designed the questions to meet the requirements of Rule 11

5    as well as to cover all areas of inquiry that you might have

6    had throughout the period of your representation by Mr.

7    Walker that deal with understanding your case; that deal

8    with understanding the law that applies to your case; that

9    deals with investigation of your case.  In other words, I've

10   designed this so that your answers today can be later used

11   against you if you would file a motion for an appeal or a

12   motion for a writ of habeas corpus.  That's because what you

13   say today is being recorded and the Court later on would

14   have a right to look back at it and say--or look at it and

15   compare what you say today with what you may be saying later

16   on.  Do you understand that, sir?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  All right.  All right.  Now my

19   understanding is you're proposing to plead guilty to Count

20   One of the Indictment.  Is that correct?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  That's pursuant to an agreement that

23   you have reached with the United States Attorney's Office.

24   Do you have a copy of that with you?

25             THE DEFENDANT:  Yes, sir.

6

1          THE COURT:  Now Ms. Montoro is going to summarize

2     that agreement for us on the record.  I want you to listen

3     to it, follow along with your copy so that your mind is

4     refreshed as to what you've agreed to and you'll be able to

5     answer questions about it when we get to that point.  Ms.

6     Montoro.

7          MS. MONTORO:  The plea agreement is dated April

8     29th, 2015.  It's five pages long.  Mr. Ganim and his

9     counsel, Mr. Walker, have signed each page of the agreement

10    on May 4th, 2015 and I have signed the agreement on behalf of

11    the Government.

12       Paragraph one sets forth that Mr. Ganim is agreeing to

13    plead guilty to Count One of the Indictment charging him

14    with travel with intent to engage in illicit sexual conduct

15    in violation of 18, U.S.C., 2423(b).

16       Paragraph two sets forth that the maximum penalty to

17    which Mr. Ganim will be exposed by virtue of his plea

18    agreement is a term of imprisonment of not more than thirty

19    years; a fine of not more than two hundred fifty thousand

20    dollars; a period of supervised release of five years to

21    life and a special mandatory assessment of one hundred

22    dollars.

23       Paragraph three sets forth that Mr. Ganim is agreeing to

24    be completely forthright and truthful with federal officials

25    and will provide sworn statements, grand jury testimony and

1    trial testimony if required and will submit to a polygraph

2    if required.  Paragraph three also sets forth that no

3    information given to Ms.--given to federal officials by Mr.

4    Ganim during a statement or testimony will be used against

5    him in any subsequent prosecution by the United States.

6        Paragraph four sets forth that the United States is

7    authorized to state that the Prosecuting Attorney for West--

8    for Preston County, West Virginia will not prosecute Mr.

9    Ganim for the conduct which forms the basis of the federal

10   indictment against him.

11       Paragraph five sets forth that the Government--if Mr.

12   Ganim complies with the cooperation agreement, the

13   Government will recommend that--excuse me, I'm sorry.

14   Paragraph five sets forth that the Government will not use

15   any information provided by Mr. Ganim against him except if

16   he perjures himself or gives false statements to federal

17   agents.

18       Paragraph six sets forth that the United States will

19   advise the Sentencing Court of Mr. Ganim's forthrightness

20   and truthfulness, or lack thereof, for the Sentencing Court

21   to consider during sentencing.

22       Paragraph seven sets forth that the Government has not

23   told Mr. Ganim what his sentence will be; that this plea

24   agreement is a nonbinding recommendation by the Government

25   and Mr. Ganim understands that the Court is not bound by the

1    recommendations and that Mr. Ganim will not have the right

2    to withdraw his guilty plea if the Court does not follow the

3    sentencing recommendations.

4        Paragraph eight sets forth that if Mr. Ganim accepts

5    responsibility he will be--the United States will recommend

6    a two level reduction in his guideline range and that if he

7    provides timely notice of his intent to plead guilty, which

8    he has, again the United States will recommend an additional

9    one level reduction and that the United States will

10   recommend that a sentence of incarceration be imposed at the

11   low end of the applicable guideline range.

12       Paragraph nine sets forth that if Mr. Ganim fails to

13   comply with the agreement then the United States would not

14   be bound to make the foregoing recommendations and Mr. Ganim

15   will not have the right to withdraw his plea.

16       Paragraph ten sets forth that the parties are

17   stipulating that on or about October 1, 2014, in Preston

18   County, West Virginia, in the Northern District and

19   elsewhere, Mr. Ganim traveled in interstate commerce outside

20   the State of West Virginia to Preston County for the purpose

21   of engaging in illicit sexual conduct with another person.

22   The parties further stipulate that Mr. Ganim, who was 29

23   years old at the time, traveled from outside the State of

24   West Virginia where he committed--into West Virginia where

25   he committed West Virginia offenses of third degree sexual

1    assault by engaging in anal and oral sexual intercourse with

2    a twelve year old person.  The parties further stipulate and

3    agree that the base offense level is 24.  The parties

4    further stipulate and agree that a two level enhancement

5    applies for undue influence given that the victim was more

6    than ten years younger than Mr. Ganim.  The parties also

7    stipulate and agree that a two level enhancement applies for

8    the use of a computer.  The parties further stipulate and

9    agree that a two level enhancement applies for sexual

10   contact and the parties further stipulate and agree that a

11   five level increase applies for pattern of activity.  The

12   parties also agree that no further enhancements apply.

13       Paragraph eleven sets forth that the United States

14   reserves the right to provide the Court and the Probation

15   Office with information in connection with a presentence

16   investigation and that the United States also retains the

17   right to respond to questions raised by the Court or to

18   correct inaccuracies or inadequacies in the Presentence

19   Report.

20       Paragraph twelve sets forth that Mr. Ganim understands

21   that the United States Sentencing Guidelines are advisory

22   and not mandatory and that as such the Sentencing Court may

23   impose a sentence below or above the guideline range so

24   that--so long as the sentence is reasonable and within the

25   statutory maximum.

1        Paragraph thirteen sets forth that Mr. Ganim is aware

2   that defendants are generally afforded the right to appeal a

3   sentence imposed.  Mr. Ganim has agreed to waive his right

4   to appeal if the Sentencing Court finds that his adjusted

5   offense level before reduction for acceptance of

6   responsibility is level 35 or less.  Along those same lines

7   Mr. Ganim is agreeing to waive his right to challenge his

8   conviction or sentence in a post collateral (sic) proceeding

9   except for claims of ineffective assistance of counsel or

10  prosecutorial misconduct and Mr. Ganim's agreeing that he

11  currently knows of no evidence of ineffective assistance of

12  counsel or prosecutorial misconduct.

13       Paragraph fourteen sets forth that if Mr. Ganim's plea

14  is not accepted by the Court or is later set aside or if Mr.

15  Ganim breaches any part of this agreement, the United States

16  Attorney will have the right to void the agreement.

17       And paragraph fifteen sets forth that the preceding

18  fourteen paragraphs constitute the entire agreement between

19  the parties.

20            THE COURT:  Ms. Montoro, is that the only agreement

21  that was offered to this defendant?

22            MS. MONTORO:  Your Honor, there was some back and

23  forth and I don't remember if--I believe that this was the

24  agreement that was initially offered.

25            THE COURT:  Mr. Walker, can you illuminate us?

1          MR. WALKER:  It is the only offer that we ever

2    received and it was the only offer that was a product of our

3    plea negotiations.  We had been negotiating some of the

4    terms there for some time.  It wasn't--this wasn't a

5    surprise but this was the--this was the only agreement that

6    developed.

7          THE COURT:  Thank you.

8          MR. WALKER:  Yes, Judge.

9          THE COURT:  Thank you.  I'll receive that.  Mr.

10   Ganim, is the agreement as summarized the agreement that you

11   have entered into with the United States Attorney's Office?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  And you fully discussed this with your

14   attorney before signing it?

15         THE DEFENDANT:  Yes, sir.

16         THE COURT:  It's ordered filed and made a part of

17   the record.  Do you understand that you're pleading guilty

18   to a federal felony charge?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  Have you discussed with Mr. Walker that

21   you have a right to have the United States District Judge

22   who will sentence you conduct today's change of plea

23   hearing?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  Do you understand that as a Magistrate

12

1      Judge I don't have the same powers as the District Judge who

2      will sentence you?  I have very limited powers and because

3      of that the only way I can conduct this change of plea

4      hearing is with your consent.  Any consent that you give

5      must be your own free, voluntary, knowing and intelligent

6      consent.  Do you understand that?

7                   THE DEFENDANT:  Yes.

8                   THE COURT:  Do you want to consent?

9                   THE DEFENDANT:  Yes, sir.

10                  THE COURT:  Is that your own free, voluntary,

11     knowing and intelligent decision?

12                  THE DEFENDANT:  Yes, sir.

13                  THE COURT:  Are you willing to reduce that to

14     writing?

15                  THE DEFENDANT:  Yes, sir.

16                  THE COURT:  I'm going to give you a form that

17     accomplishes that.  Please review it with Mr. Walker.

18         (Counsel and defendant reviewing and executing form)

19                  THE COURT:  The waiver and consent as signed by Mr.

20     Ganim is ordered filed and made a part of the record.

21         What is your name, sir?

22                  THE DEFENDANT:  Patrick Ganim.

23                  THE COURT:  How old are you?

24                  THE DEFENDANT:  Twenty-nine (29).

25                  THE COURT:  How far did you go in school?

13

1          THE DEFENDANT:  Eleventh Grade and then I got my

2     GED.

3          THE COURT:  You are then able to read, write, speak

4     and understand English?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Are you able to read without glasses or

7     contact lenses today?

8          THE DEFENDANT:  I have contact lenses in.

9          THE COURT:  And you're able to read all right then

10    with them?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  Are you able to hear all right?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  Are you able to concentrate on what is

15    going on around you?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Have you understood what I've asked or

18    said to you up to this point?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Have you been treated for a mental

21    illness, psychiatric or psychological problem in the last

22    six months?

23         THE DEFENDANT:  No, sir.

24         THE COURT:  Have you been treated for addiction to

25    narcotic drugs within the last sixty days?

14

1          THE DEFENDANT:  No, sir.

2          THE COURT:  Is your mind clear as you sit in this

3    hearing room?

4          THE DEFENDANT:  Yes.

5          THE COURT:  In the last twenty-four hours have you

6    taken an illegal drug or drugs?

7          THE DEFENDANT:  No, sir.

8          THE COURT:  In the last twenty-four hours have you

9    taken any prescription medication?

10          THE DEFENDANT:  Ibuprofen.

11          THE COURT:  Ordinarily that's an over-the-counter

12    medication but it may be that it's of a prescription

13    strength; I don't know.  What did you take it for?

14          THE DEFENDANT:  Back pain from an old injury.

15          THE COURT:  Is the back pain from an old injury or

16    the Ibuprofen that you've took for that back pain, either

17    separately or in combination with each other, in any way

18    affecting your ability to hear, understand and respond to my

19    questions, talk with Mr. Walker about your case or make your

20    own decisions about your case?

21          THE DEFENDANT:  No, sir.

22          THE COURT:  Other than the Ibuprofen have you taken

23    any other over-the-counter or prescription medications in

24    the last twenty-four hours?

25          THE DEFENDANT:  No, sir.

1          THE COURT:  Have you consumed alcohol in the last

2     twenty-four hours?

3          THE DEFENDANT:  No, sir.

4          THE COURT:  As you sit here in this hearing room do

5     you have any physical, emotional, psychological or

6     psychiatric condition which in any way affects your ability

7     to hear, understand and respond to my questions, talk with

8     Mr. Walker about your case or make your own decisions about

9     your case?

10          THE DEFENDANT:  No, sir.

11          THE COURT:  Did you receive a copy of the Grand

12     Jury Indictment?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  Did you read the charges that were made

15     against you in that Indictment?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Do you understand that even should you

18     plead guilty to Count One of that Indictment, you are--will

19     remain charged under Counts Two and Three of that Indictment

20     unless and until those charges are dismissed, presumably at

21     the end of your sentencing hearing, on motion of the United

22     States?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  Count One charges you as follows:

25     Travel with intent to engage in illicit sexual conduct.  The

1    Grand Jury alleges on or about October 1, 2014, in Preston

2    County, West Virginia, in the Northern District of West

3    Virginia, and elsewhere, the defendant Patrick W. Ganim

4    traveled in interstate commerce from outside the State of

5    West Virginia to Preston County, West Virginia for the

6    purpose of engaging in illicit sexual conduct with another

7    person; that is to say, the defendant, who was twenty-nine

8    years of--twenty-nine years old at the time, traveled from

9    outside the State of West Virginia to Preston County, West

10   Virginia, where he committed West Virginia offenses of Third

11   Degree Sexual Assault by engaging in anal and oral sexual

12   intercourse with a twelve year old person, in violation of

13   Title 18, United States Code, Section 2423(b).

14        There are certain elements that the Government must be

15   able to prove relative to this crime.  They must be able to

16   prove:

17        1.  That it was you, Patrick W. Ganim, who committed the

18   crime.

19        2.  That you traveled from outside of the State of West

20   Virginia into the State of West Virginia, crossing the state

21   line and going in to Preston County, West Virginia; that at

22   the time of that travel, on or about October 1, 2014, it was

23   your intent and the purpose of that travel to engage in

24   illicit sexual activity, in this case anal and oral sexual

25   intercourse, with a minor, a twelve year old person.

1          Do you understand that's the elements of the crime?

2                THE DEFENDANT:  Yes, sir.

3                THE COURT:  Did you thoroughly read that Count of

4     the Indictment?

5                THE DEFENDANT:  Yes, sir.

6                THE COURT:  Did your attorney read and review the

7     charges in the Indictment to you word by word and line by

8     line?

9                THE DEFENDANT:  Yes, sir.

10               THE COURT:  Do you understand those charges?

11               THE DEFENDANT:  Yes, sir.

12               THE COURT:  Do you need any additional time to

13    further discuss the charge in Count One or any of the

14    charges with your attorney?

15               THE DEFENDANT:  No, sir.

16               THE COURT:  How did you get along with Mr. Walker

17    as counsel?

18               THE DEFENDANT:  Okay.

19               THE COURT:  How many times did you and Mr. Walker

20    get together in person or on the phone or some other way to

21    talk about your case?

22               THE DEFENDANT:  Four or five times I believe.

23               THE COURT:  Was the four or five times that you did

24    get together with Mr. Walker sufficient for you to have a

25    complete and full understanding of the law and the facts

1   that apply to your case?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  Did you ask Mr. Walker questions?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Did Mr. Walker answer your questions?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  Is there any question that you asked

8   him that he failed or refused to answer for you?

9          THE DEFENDANT:  No, sir.

10          THE COURT:  Were the answers that he did give you

11   to your questions satisfactory?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  Is there anything you asked Mr. Walker

14   to do for you that you think Mr. Walker improperly failed or

15   refused to do for you?

16          THE DEFENDANT:  No, sir.

17          THE COURT:  Did you and Mr. Walker discuss the

18   elements of the crime in Count One of the Indictment that

19   the Government must be able to prove in a way similar to

20   what I just did with you?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  Did you and Mr. Walker discuss, talk

23   about the evidence that the Government says it has and says

24   it would use to prove you guilty of that crime if you went

25   to trial?

19

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Did you review that evidence?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  After looking at the evidence and

5    discussing your case with your attorney, did you come to a

6    conclusion in your own mind that the Government did have

7    sufficient evidence that it could present at trial that

8    would convince a jury beyond a reasonable doubt that you

9    were guilty?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Did you and Mr. Walker discuss whether

12   or not there were possible defenses that you might be able

13   to raise to this charge?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  Did you ask him to explore those

16   defenses?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Did he?

19          THE DEFENDANT:  I believe so.

20          THE COURT:  Why aren't you using those defenses, or

21   any one of them?

22      (Pause)

23          THE COURT:  Is it because after reviewing those

24   defenses or possible defenses you decided in your mind that

25   none of them were sufficient to convince even a single juror

20

1   that there was a reasonable doubt as to your guilt?

2             THE DEFENDANT:  Yes, sir.

3             THE COURT:  Did you ask Mr. Walker to investigate

4   any witnesses?

5             THE DEFENDANT:  No, sir.

6             THE COURT:  Is that because there were no witnesses

7   that you thought he should investigate?

8             THE DEFENDANT:  Yes.

9             THE COURT:  Did you tell him there were any

10  witnesses that you thought should be investigated?

11            THE DEFENDANT:  No.

12            THE COURT:  If I gave you additional time today, do

13  you know of any witness that you didn't tell Mr. Walker

14  about before today that if you did tell him it might make a

15  difference between going to trial or pleading guilty?

16            THE DEFENDANT:  No, sir.

17            THE COURT:  Did you and Mr. Walker talk about the

18  criminal proceedings you have been going through?

19            THE DEFENDANT:  Yes.

20            THE COURT:  Did you and he talk about how a jury

21  trial would be conducted if you did not plead guilty?

22            THE DEFENDANT:  Yes.

23            THE COURT:  Did you and Mr. Walker talk about the

24  maximum statutory penalty you are subjecting yourself to by

25  pleading guilty to this particular crime?

1                    THE DEFENDANT:  Yes, sir.

2                    THE COURT:  Then do you understand from that

3    discussion, as well as paragraph two of your plea agreement,

4    the maximum statutory penalty the Court can impose is a term

5    of imprisonment of not more than thirty years; a fine of not

6    more than two hundred and fifty thousand dollars; a period

7    of supervised--of course you could be both fined and

8    imprisoned and a period of supervised release, which must be

9    at least five years but can extend out to life?

10                   THE DEFENDANT:  Yes, sir.

11                   THE COURT:  Did you understand that supervised

12   release was in addition to any term of imprisonment?

13                   THE DEFENDANT:  Yes, sir.

14                   THE COURT:  Are you a citizen of the United States?

15   In other words, were you born here, sir?

16                   THE DEFENDANT:  Yes.

17                   THE COURT:  If you were not already a citizen of

18   the United States and then were found guilty or pled guilty

19   to this felony crime, do you fully understand that a non-

20   citizen, at the conclusion of his or her sentence, could be

21   deported by the United States?

22                   THE DEFENDANT:  Yes, sir.

23                   THE COURT:  A non-citizen could be denied

24   application for citizenship in the United States?

25                   THE DEFENDANT:  Yes, sir.

1          THE COURT:  And a non-citizen could be denied entry

2    into the United States from outside of its borders?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  Did you and Mr. Walker talk about the

5    sentencing process that the District Judge is going to use?

6          THE DEFENDANT:  About the guideline charts and

7    rating system?

8          THE COURT:  Yes, sir.

9          THE DEFENDANT:  Yes.

10          THE COURT:  Did you understand from that discussion

11    then that as part of the sentencing process, number one, the

12    Judge is going to calculate an advisory sentencing guideline

13    range for your case?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  Number two, she's going to consider

16    that range and possible departures upward and downward,

17    including the upward departures that you and the Government

18    have agreed to in the stipulation in your plea agreement.

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  She's also going to consider sentencing

21    factors that are set out by Congress in 18 United States

22    Code, Section--I believe it's 3553(a).  Do you understand

23    that?  If you need to talk with your attorney about

24    sentencing factors, please feel free to do that.

25          THE DEFENDANT:  Yeah, one quick second.

23

1          (Pause - Counsel and Defendant conferring)

2               THE DEFENDANT:  Yes, I did remember the number of

3     that.

4               THE COURT:  All right.  Thank you.  Now, sir, do

5     you fully understand from your discussions with your

6     attorney that the District Judge does not have to give you

7     the calculated guideline sentence as the actual sentence

8     that she imposes?

9               THE DEFENDANT:  Yes, sir.

10               THE COURT:  In other words, you understand those

11     advisory guidelines are just that, advisory; they're not

12     binding on the District Judge?

13               THE DEFENDANT:  Yes, sir.

14               THE COURT:  Did Mr. Walker promise you how much

15     time you were going to get?

16               THE DEFENDANT:  Approximately ten years.

17               THE COURT:  Did he promise you you would only get

18     ten years?

19               THE DEFENDANT:  Said about ninety-percent chance

20     I'd get ten years.

21               THE COURT:  Well I want you to understand that

22     while Mr. Walker may have represented that to you, you can't

23     take that as a promise or a guarantee to you that you're

24     going to get ten years, or about ten years.  Do you

25     understand that?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  And the reason he can't promise that is

3    because only a District Judge sentences you and the District

4    Judge will not even consider what sentence to impose until

5    she has reviewed the proceedings from today, the Report and

6    Recommendation I'll write; until she has reviewed any

7    Presentence Investigation Report that's prepared and until

8    she has heard any objections that might be filed to that

9    report and finally until she's heard both you and the

10   Government and any witnesses you all may call at your

11   sentencing hearing.

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  And do you--

14          MR. WALKER:  May I just comment on that, Judge?

15          THE COURT:  Yes, sir.

16          MR. WALKER:  Of course I have to recommend an

17   opinion in every case of what the sentencing exposure is and

18   the likely sentence under the guidelines.  In this case, the

19   way we approached the plea negotiations and the settlement,

20   the parties made an effort to detail as precisely as

21   possible the guidelines that would apply in this particular

22   case and of course that's something that is a careful

23   process and of course that's something that's a deliberative

24   and thoughtful process so we came up with a stipulation that

25   at least as far as the United States of America is concerned

1    and Mr. Ganim is concerned, doesn't allow for any question

2    or gray area, that kind of thing, between the parties.  So

3    my estimate is based on that stipulation and based on also

4    the low end recommendation as contemplated by the plea

5    agreement.  Of course it's not a promise; never was a

6    promise but it is an estimate and an opinion and I stand

7    behind that.  Not only do I stand behind it but it's my

8    policy in every case to document in writing my opinions

9    about the likely sentence that will flow from a settlement

10   and my opinions about the likely result if convicted after a

11   trial so, of course, in keeping with my practice and the

12   policy of my office I did those things and documented the

13   other aspects of our conversations so that, you know, my

14   client is not there without anything in black and white to

15   rely on.  I think that that's the least that I can do for

16   someone who's facing some fairly serious charges but I think

17   he'll agree there's no guarantee and no promise and there's

18   an understanding that the plea agreement could be rejected

19   by the District Court.  The likelihood of that may be a

20   subject of another conversation, but it is a possibility and

21   he knows that and I have explained that.

22           THE COURT:  Okay.  Thank you, Mr. Walker.

23           MR. WALKER:  Yes, sir.

24           THE COURT:  Mr. Ganim, you were sitting there

25   listening to your attorney, does that statement that he just

1    made comply with what you remember him talking to you about?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Now, are you completely satisfied with

4    the legal assistance, counseling, advice and actions that he

5    has provided to you?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  Is there anything that he should have

8    done and didn't do in your case?

9              THE DEFENDANT:  No, sir.

10             THE COURT:  Is there anything that he did do and as

11   you look back on it you wish he had not done it?

12             THE DEFENDANT:  No, sir.

13             THE COURT:  Now you've indicated you think your

14   actual sentence that's going to be imposed by the District

15   Judge is somewhere around ten years.  Is that a fair

16   statement?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  Actually you don't know what your

19   actual sentence is going to be as you sit here today, do

20   you?

21             THE DEFENDANT:  No, sir.

22             THE COURT:  You know it cannot be more than thirty

23   years?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  And you know that your guidelines, if

1    you get the benefit of the plea agreement and the Judge goes

2    along with the plea agreement will end somewhere's in the

3    nature of a level--bear with me a moment--a level 35 before

4    reductions for acceptance of responsibility, timely

5    acceptance of responsibility.  Is that correct?

6             THE DEFENDANT:  Yes, sir.

7             THE COURT:  So if you got those reductions called--

8    that your plea agreement speaks to, you'd be at a level 32,

9    correct?

10            THE DEFENDANT:  Yes, sir.

11            THE COURT:  Level 32 under the advisory guidelines

12   for a Criminal History Category 0 to I is between 121 and

13   151 months.

14            THE DEFENDANT:  Yes, sir.

15            THE COURT:  And you understand that 120 months is

16   ten years?

17            THE DEFENDANT:  Yes, sir.

18            THE COURT:  And you're hoping for the low end of

19   the advisory guidelines?

20            THE DEFENDANT:  Yes, sir.

21            THE COURT:  And you know as you sit here today that

22   there's no guarantee to you that the District Judge will

23   give you the low end of those advisory guidelines?

24            THE DEFENDANT:  Yes.

25            THE COURT:  So all that was an exercise by me to

28

1    make sure that you understood, and tell me you understood,

2    that you don't know what your actual sentence from the

3    District Judge is going to be when you get to sentencing

4    some six, eight or more weeks from today.  Is that a fair

5    statement?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Are you willing to plead guilty today

8    not knowing what your actual sentence is going to be some

9    six, eight or ten or more weeks from now, Mr. Ganim?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  Do you fully understand that if you

12   receive an actual sentence of more time than what you are

13   hoping for within the statutory maximum that you will not

14   then have a right to change your mind and withdraw your plea

15   of guilty?

16       (Pause - Counsel and Defendant conferring)

17             THE COURT:  Do you need me to repeat that?

18             VOICE:  Is he allowed to talk to family?

19             THE COURT:  I don't know who's talking in the back,

20   but keep quiet or I'll have you removed.

21             THE DEFENDANT:  So if it's not within the 121 to

22   151 then I cannot appeal back to that place where I signed

23   the plea that was?

24             THE COURT:  I'll direct that question to your

25   attorney.  The answer is your attorney can answer that

1    question, sir.

2         (Pause - Counsel and Defendant conferring)

3         MR. WALKER:  Judge, I answered the question.

4    Sooner or later we're going to get around to the appellate

5    rights provision of the plea agreement--

6         THE COURT:  Sure.

7         MR. WALKER: --and the way that I read the provision

8    and understand the provision, the way I've explained it to

9    Mr. Ganim is that if he is sentenced at a level above what's

10   contemplated, his base offense level, then he would--he

11   would be able to appeal.

12        THE COURT:  That's correct.  Appeal, not withdraw

13   his guilty plea.

14        MR. WALKER:  That's right.

15        THE COURT:  There's a difference.

16        MR. WALKER:  There's some room for appeal.  It's

17   probably what we would call a limited waiver under the plea

18   agreement.  It's based on a level 35.

19        THE COURT:  Right.  Well, Mr. Ganim, my--

20        MR. WALKER:  I think it's important, Judge--I think

21   it's important to say that this is a nonbinding plea

22   agreement and that's the way that it--it's been explained to

23   him.

24        THE COURT:  Sure.  Mr. Ganim, what I want you to

25   understand is that if you don't get the sentence that you're

30

1   hoping for from Judge Keeley at sentencing and it's higher

2   than what you're expecting, that will not allow you the

3   right to withdraw your guilty plea that you make today.

4   There's a difference between pleading guilty and being

5   sentenced.  Pleading guilty is admitting that you did what

6   you're accused of.  The sentence is the punishment that you

7   receive for what you did so with that in mind, yes, you may

8   appeal under the provisions of your plea agreement,

9   depending on where your sentence is but that doesn't get--

10  mean the same thing as asking the Judge to let you withdraw

11  your guilty plea.  She's not going to let you do that.  Do

12  you understand that?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  Now do you completely understand the

15  difference between pleading guilty and sentencing?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  Did you read each and every word and

18  line of your written plea agreement, sir?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  Did Mr. Walker read each and every word

21  and line of that plea agreement to you?

22          THE DEFENDANT:  We went over it; yes.

23          THE COURT:  Did he stop as he went through it and

24  explain various legal words and legal citations, sir?

25          THE DEFENDANT:  Yes.

31

1          THE COURT:  Were they sat--were his explanations

2    satisfactory to you?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Do you need any additional time to

5    further discuss the agreement with Mr. Walker before we move

6    forward?

7       (Pause)

8          THE DEFENDANT:  No, sir.

9          THE COURT:  Has anybody made any promises to you in

10   order to get you to plead guilty other than what are in that

11   written plea agreement, sir?

12         THE DEFENDANT:  No, sir.

13         THE COURT:  Do you understand that the Court had

14   nothing to do with preparing the language or negotiating the

15   language of your plea agreement?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Do you fully understand that the

18   District Judge will withhold her decision whether she's

19   going to go along with anything in your plea agreement until

20   she's had the benefit of the Presentence Report and until

21   she's had the opportunity to hear you and the Government at

22   your sentencing hearing?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  Now we were talking earlier with Mr.

25   Walker and you together about the nonbinding recommendations

1    that are contained in your plea agreement and they're found

2    on the third page, paragraph seven and eight.  If you've met

3    all the preconditions you are hoping that, and Ms. Montoro

4    has agreed that she will stand before the Judge and

5    recommend that you get a two level reduction for acceptance

6    of responsibility; that you receive an additional one level

7    reduction for timely acceptance of responsibility and that

8    any sentence of incarceration that the Judge imposes quote

9    "should be at the lowest end of the applicable guideline

10   range".  Do you fully understand that it's up to Judge

11   Keeley whether to go along with those recommendations?

12            THE DEFENDANT:  Yes, sir.

13            THE COURT:  Do you understand that if she were to

14   not go along with any one or combination of those three

15   recommendations, her advisory guideline sentence might be

16   higher than it would have been had she gone along with them?

17            THE DEFENDANT:  Yes, sir.

18            THE COURT:  And do you also understand that your

19   actual sentence within the statutory maximum might be higher

20   than had she gone along with them?

21            THE DEFENDANT:  Yes, sir.

22            THE COURT:  And do you understand that if that

23   would occur you will quote "have no right to withdraw a

24   guilty plea if the Court does not follow the sentencing

25   recommendations set forth in the plea agreement"?

33

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  That's right there at the end of

3     paragraph seven, isn't it?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  There's also a--what we call a

6     nonbinding stipulation, Mr. Ganim.  We've been talking about

7     that.  That's in paragraph numbered ten and under that

8     paragraph you and Ms. Montoro's office agree that the

9     following facts and information is stipulated, and that

10    means simply agreed to between you and Ms. Montoro's office.

11       First:  That on or about October 1st, 2014, in Preston

12    County, West Virginia, in the Northern District of West

13    Virginia and elsewhere, the defendant, Patrick W. Ganim,

14    traveled in interstate commerce from outside the State of

15    West Virginia to Preston County, West Virginia, for the

16    purpose of engaging in illicit sexual conduct with another

17    person.  Basically the elements of the crime.  Correct, sir?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  You further stipulate and agree that

20    Mr. Ganim, who was twenty-nine years of age at the time,

21    traveled from outside the State of West Virginia to Preston

22    County, West Virginia, where he committed West Virginia

23    offenses of third degree sexual assault by engaging in anal

24    and oral sexual intercourse with a twelve year old person.

25    You agreed to that, correct, sir?

34

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  And that's more factual evidence that

3    would have to be proved if the case went to trial, right,

4    sir?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Then it goes on to say that you further

7    stipulate and agree that the appropriate base offense level

8    is 24 pursuant to the Guideline 2G1.3(a)(4); further

9    stipulate and agree that a two level enhancement, that's

10   increase, applies for undue influence given that the victim

11   was more than ten years younger than Mr. Ganim pursuant to

12   Guideline 2G1.3(b)(2)(B).  You further stipulate and agree

13   that a two level enhancement, increase, applies for the use

14   of a computer pursuant to Guideline 2G1.3(b)(3)(A).  You

15   further stipulate and agree that another two level

16   enhancement applies for sexual contact pursuant to Guideline

17   2G1.3(b)(4)(A).  Then you and Ms. Montoro further agree and

18   stipulate that a five level increase applies for a pattern

19   of activity pursuant to Guideline 4B1.5(b) and then you go

20   on to further agree with Ms. Montoro that there are no

21   further enhancements under those advisory guidelines.  Now

22   you understood that paragraph, didn't you?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  And you understood that's how you got

25   to the level of 35?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  And then you're hoping that paragraph--

3 the three level reduction under paragraph eight will get you

4 reduced down to a level 32, is that correct?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Do you understand that District Judge

7 Keeley at sentencing could reject any one or combination of

8 those nonbinding stipulations?

9          THE DEFENDANT:  Yes, sir.

10         THE COURT:  Do you understand she can make her own

11 findings of fact at sentencing by a preponderance of

12 evidence standard without a jury present?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  Do you understand that if she were to

15 enter--impose a sentence that calls for you to spend more

16 time in jail then what would be called for under the

17 stipulation in paragraph ten, you will not then have a right

18 to change your mind and withdraw your guilty plea?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  Do you need any additional time to

21 discuss any of that with your attorney?

22         THE DEFENDANT:  No, sir.

23         THE COURT:  Has anyone attempted in any way to

24 force you to plead guilty, sir?

25         THE DEFENDANT:  No, sir.

1           THE COURT:  Has anyone threatened you or someone

2    close to you in order to get you to plead guilty?

3           THE DEFENDANT:  No, sir.

4           THE COURT:  Is your decision to plead guilty your

5    idea or Mr. Walker's idea?

6           THE DEFENDANT:  My idea.

7           THE COURT:  Other than what's contained in your

8    plea agreement, has anyone offered or promised you anything

9    to get you to plead guilty?

10          THE DEFENDANT:  No, sir.

11          THE COURT:  Do you believe the Government's

12   evidence is sufficient to prove you guilty beyond a

13   reasonable doubt of Count One?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  Did you and Mr. Walker talk over the

16   consequences of pleading guilty to this federal felony?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  Now I'm going to go over these one by

19   one but I want you to understand some of them will be a

20   repeat of what we've already done.  First, you're going to

21   be adjudicated guilty of a felony offense.

22          THE DEFENDANT:  Correct.

23          THE COURT:  Second: As a result of that, you may

24   lose the right to vote.

25      Third:  You may lose the right to serve on a grand or

1    petit, state or federal jury.

2        Fourth:  You may lose the right to run for and hold a

3    public office.

4        Fifth:  You are going to lose--you will lose the right

5    to possess a firearm or ammunition for a firearm as those

6    terms are defined under federal law for any purpose and for

7    the rest of your life.

8        Six:  You are going to be subject to a sentence of

9    imprisonment.  That imprisonment is for a term that cannot

10   exceed thirty years.

11       Seven:  If the District Judge finds you have the ability

12   to pay a fine, the District Judge could impose a fine up to,

13   but not more than two hundred and fifty thousand dollars.

14       Eight:  You could be both fined and imprisoned.

15       Ninth:  You're going to be subject to a term of

16   supervised release; the minimum period of which could be

17   five years, but it could extend to life and that is in

18   addition to any term of imprisonment; and,

19       Tenth:  You're going to be subject to a special

20   assessment of one hundred dollars whether you have the

21   hundred dollars to pay it or not.

22       Do you understand all that, sir?

23           THE DEFENDANT:  Yes, sir.

24           THE COURT:  And you fully discussed all that with

25   your attorney?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Did you and Mr. Walker discuss criminal

3   history?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Did you tell him what, if any, criminal

6   history you had?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Did you and he look at any criminal

9   history that the Government may have provided in its

10  discovery, in other words, a Government rap sheet?

11         MR. WALKER:  He doesn't--he doesn't have any

12  criminal history.

13         THE COURT:  Doesn't have any?

14         MR. WALKER:  Right.

15         THE COURT:  Okay.  Then the next question should be

16  easy for you.  Your understanding of your own criminal

17  history matches the Government's understanding of your

18  criminal history; is that correct?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  Do you understand that criminal history

21  can play a part in sentencing?

22         THE DEFENDANT:  Yes, sir.

23         THE COURT:  Particularly if the person, and I'm not

24  saying you do, but particularly if the person being

25  sentenced had prior firearm offense convictions, prior

39

1    violent felony offense convictions or prior drug offense

2    convictions, state or federal; those have to be taken into

3    account and they do serve to increase any guideline sentence

4    and any actual sentence within the statutory maximum.

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  And that's the purpose by which Mr.

7    Walker inquired about your criminal history and you reviewed

8    the Government's criminal history; is that correct?

9            THE DEFENDANT:  Yes.

10           THE COURT:  And you understood that when you were

11   going through it, didn't you?

12           THE DEFENDANT:  Yes.

13           THE COURT:  Do you understand that if Judge Keeley

14   were to find you had the ability to pay she could impose on

15   you the cost of your own incarceration, community

16   confinement and/or supervised release?

17           THE DEFENDANT:  Yes.

18           THE COURT:  Do you understand that as a convicted

19   federal felon you will be required to supply a DNA sample

20   and that sample will remain on file against you, your name,

21   your identifiers beyond your natural lifetime?

22           THE DEFENDANT:  Yes.

23           THE COURT:  Do you understand from your discussions

24   with Mr. Walker that there is no parole in the federal

25   criminal system?

40

1            THE DEFENDANT:  Yes.

2            THE COURT:  Do you understand from that discussion

3     that that means you will do the time you are sentenced to

4     serve?

5            THE DEFENDANT:  Yes.

6            THE COURT:  Did you and he talk about how good time

7     works?

8            THE DEFENDANT:  Yes, sir.

9            THE COURT:  Do you understand that the Court does

10    not control good time?

11           THE DEFENDANT:  Yes, sir.

12           THE COURT:  And did you understand from that

13    discussion that good time is in fact controlled by the

14    Bureau of Prisons through the Warden and staff at the prison

15    you're going to be assigned to to serve your time?

16           THE DEFENDANT:  Yes, sir.

17           THE COURT:  We've been all over this Uniform

18    Sentencing Guideline chart I'm now holding up in my hand.

19    You and Mr. Walker very carefully reviewed that chart with

20    all of the deductions and enhancements that are called for

21    in your plea agreement; correct, sir?

22           THE DEFENDANT:  Yes, sir.

23           THE COURT:  And he showed you how Criminal History

24    Categories going across the top of the chart worked and

25    because, based on what you've told me you don't have any

1    prior criminal history, you would be a 0 to I Category.  Is

2    that your understanding also?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  And as you go down the left-hand column

5    of the chart, that's the various offense levels; correct,

6    sir?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  And you understood how the chart worked

9    is once you've got all the offense levels calculated in, you

10   go over to the Criminal History Category and that gives you

11   a range of months of imprisonment under the advisory

12   guidelines?

13             THE DEFENDANT:  Yes, sir.

14             THE COURT:  You understand, don't you, that because

15   Mr. Walker gave you his best estimates and best advice

16   concerning how the guidelines work and how the calculations

17   work, that's not a guarantee or a promise to you that at

18   sentencing, some six, eight, ten weeks from now, Judge

19   Keeley's going to see it the same way he did?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  And if Judge Keeley sees it differently

22   and imposes a sentence that calls for more time than what

23   Mr. Walker may have predicted for you or projected, do you

24   understand you will not then have a right to change your

25   mind and withdraw your guilty plea?

1           THE DEFENDANT:  Yes, sir.

2           THE COURT:  Do you understand you have a right to

3    plead not guilty, sir?

4           THE DEFENDANT:  Yes.

5           THE COURT:  And you have a right to go to a jury

6    trial.  That's guaranteed to you by the Constitution.

7           THE DEFENDANT:  Yes.

8           THE COURT:  Did you and Mr. Walker talk about all

9    the rights you have under a jury trial?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Then you understand that, number one,

12   you're presumed innocent of all the charges.

13      Two:  The Government has the burden of proving guilt

14   beyond a reasonable doubt.  They can only use lawful

15   evidence in that process.  You're entitled to the assistance

16   of counsel for your defense.

17      You have a right to be at the trial, to see and to hear

18   and have all the witnesses cross-examined in your defense.

19      You have a right to testify if you want to; however, you

20   cannot be forced to take the stand and testify if you do not

21   want to.

22      You're not required to call witnesses in defense of the

23   case against you; however, if you want to call witnesses you

24   may do that and if your witnesses are uncooperative you may

25   use the subpoena powers of the Court to require them to

43

1    attend the trial and take the oath.

2        If you decide not to testify or not to call witnesses,

3    the fact that you did not testify or call witnesses can't be

4    used as evidence against you and you have a right to a

5    unanimous jury verdict.

6        Do you understand you have all those rights?

7            THE DEFENDANT:  Yes, sir.

8            THE COURT:  Do you understand that if you plead

9    guilty to Count One today there will be no jury trial and

10   you will have given up all those rights?

11           THE DEFENDANT:  Yes, sir.

12           THE COURT:  Do you want a jury trial, sir?

13           THE DEFENDANT:  No, sir.

14           THE COURT:  Is that your own free, voluntary,

15   knowing and intelligent decision?

16           THE DEFENDANT:  Yes, sir.

17           THE COURT:  Now have you understood my questions,

18   sir?

19           THE DEFENDANT:  Yes.

20           THE COURT:  Did your--did Mr. Walker instruct you

21   to answer any particular question in any particular way?

22           THE DEFENDANT:  No, sir.

23           THE COURT:  Are the answers then you've given me

24   today your own independent answers?

25           THE DEFENDANT:  Yes.

Sinclair - Direct                                    44

1          THE COURT:  And did you truthfully answer each and

2     every question I've asked you today?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Now do you need any additional time to

5     talk anything over with Mr. Walker?

6          THE DEFENDANT:  No, sir.

7          THE COURT:  Mr. Ganim, do you still intend to plead

8     guilty?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Well then I'm going to turn to Ms.

11     Montoro and ask her to present evidence that supports the

12     plea that you're proposing to make.  It's required by Rule

13     11.  I want you to listen to it and then we'll proceed with

14     the change of plea hearing.  Ms. Montoro.

15          MS. MONTORO:  Your Honor, the Government calls

16     George Sinclair.

17          THE COURT:  Mr. Sinclair, if you'll come forward,

18     be sworn by the Clerk and then take the witness chair.

19          GEORGE SINCLAIR, GOVERNMENT'S WITNESS, SWORN

20          THE CLERK:  You may be seated.

21                         DIRECT EXAMINATION

22     BY MS. MONTORO:

23     Q.  Would you please state your name for the record?

24     A.  George Allen Sinclair.

25     Q.  And with whom are you employed?

Sinclair - Direct                                          45

1   A.   Preston County Sheriff's Office.

2   Q.   All right.  And did you come to investigate Mr. Ganim?

3   A.   Yes, I did.

4   Q.   Can you give us a brief overview of how you became

5   involved in that investigation?

6   A.   An I-Pod owned by a juvenile female was turned over to

7   one of our deputies.  I do the mobile forensics at the

8   office.  It was stated that there was some pornographic

9   pictures on the I-Pod, as well as some chat sessions.  I did

10  an analysis on the phon--on the I-Pod.  I found the

11  pornographic pictures.  I found the chat sessions.  It was

12  in Kik Messenger, between Mr. Ganim and the juvenile.

13  Q.   Okay.  Now when you received the I-Pod you didn't know

14  that it was Mr. Ganim, correct?

15  A.   No, I did not.

16  Q.   Tell us how you identified Mr. Ganim as the person with

17  whom the victim had exchanged these messages?

18  A.   I had--I got an ID from the Kik Messenger and then I put

19  out a call to--it's an IACIS, I'm on a List Serve.  It's

20  called IACIS and I asked for help on identifying this screen

21  name.  I got a reply back.  They gave me a full run down of

22  who the screen name belonged to and I found out it was Mr.

23  Ganim.

24  Q.   All right.  And based on your ability to identify Mr.

25  Ganim as the person using the user name that's corresponding

Sinclair - Direct                                    46

1   with the victim, were you able to obtain a search warrant

2   for Mr. Ganim's home?

3   A.   I sent the information to the Ohio authorities where Mr.

4   Ganim lived and they got the search warrant.

5   Q.   Okay.  And are you aware of any--anything that they

6   found during the execution of the search warrant which would

7   corroborate the fact that this was Mr.--the defendant,

8   Patrick Ganim?

9   A.   I don't know the details of that.  I know that I did

10  find pictures of Mr. Ganim on the I-Pod of the juvenile.

11  Q.   Okay.  And those correspond with your visual observation

12  of Mr. Ganim?

13  A.   Yes.  Yes.

14  Q.   During the course of your investigation, did you come to

15  interview the victim?

16  A.   Yes, I did.

17  Q.   Okay.  And can you tell us what she told you about her

18  interactions with Mr. Ganim, particularly leading up to

19  October 1, 2014?

20  A.   They had conversed back and forth on Kik Messenger.

21  There was pictures exchanged back and forth between Mr.

22  Ganim and the juvenile; arrangements were made for them to

23  meet.  Mr. Ganim was--had texted her or chatted with her and

24  said he had a delivery in the area and they met up probably

25  shortly after that.

Sinclair - Direct                                47

1   Q.  All right.  And where did Mr. Ganim travel from in order

2   to meet with the victim?

3   A.  I believe it was Bainbridge, Ohio.  It was in the Ohio

4   area.

5   Q.  Is that near Cleveland?

6   A.  Yes.  Yes.

7   Q.  And where did he travel to?

8   A.  Reedsville, West Virginia.

9   Q.  And that's in the Northern District of West Virginia?

10  A.  Yes, in Preston County.

11  Q.  Okay.  And during the investigation were cell phone

12  records obtained that demonstrate Mr. Ganim's travel from

13  Cleveland to Preston County?

14  A.  Yes.

15  Q.  What did the victim tell you occurred--tell you had

16  occurred between her and Mr. Ganim when he traveled to

17  Preston County, Reedsville?

18  A.  I believe she was staying--she was staying with her

19  father.  She snuck out of the house and met him at--it's

20  called Luigi's Sport's Center.  It's a bowling alley.  She

21  met him in the parking lot.  They went back to his truck.

22  She performed oral sex on him and then anal sex.

23  Q.  Okay.  So he had anal intercourse with her and compelled

24  her to perform oral sex on him?

25  A.  Yes.

Sinclair - Cross                          48

1   Q.  After this--and this encounter occurred on October 1,

2   2014?

3   A.  Yes.

4   Q.  And after the--that encounter occurred, did Mr. Ganim

5   continue corresponding and communicating with the victim?

6   A.  Yes.

7   Q.  Okay.  I think we've discussed that on October 1, 2014--

8   well, how old was Mr. Ganim on that date of this encounter?

9   A.  Twenty-nine (29) years old.

10  Q.  Okay.  And how old was the victim on that date?

11  A.  Twelve (12) years old.

12  Q.  And during the course of your investigation did you

13  learn that Mr. Ganim knew at least that the victim was a

14  minor?

15  A.  Yes.

16       MS. MONTORO:  Okay.  Those are all the questions I

17  have.

18       THE COURT:  Mr. Walker, anything additional from

19  you, sir?

20       MR. WALKER:  Yes, sir.  Thank you.

21                   CROSS EXAMINATION

22  BY MR. WALKER:

23  Q.  You mentioned the cell phone records and that the cell

24  phone records indicate some travel?

25  A.  Yes, sir.

Sinclair - Cross                              49

1    Q.  Can you explain the nature of the records and what--what

2    they showed?

3    A.  It was a--it was a map that I saw and it showed Mr.

4    Ganim's cell phone pinging off certain towers from Ohio

5    traveling down through Pennsylvania, through West Virginia

6    into Preston County.

7    Q.  And during what time period?

8    A.  It was in October.

9    Q.  Okay.  The same month--

10   A.  Of 2014, yes, sir.

11   Q.  --of the allegations?

12   A.  Yes, sir.

13   Q.  Okay.  Now how did you use that to corroborate the

14   information in the case?

15   A.  I don't understand.

16   Q.  Did you look at the cell phone information before you

17   talked with the victim or after?  How did that factor into

18   the investigation?

19   A.  I, myself, had subpoenaed Kik Messenger to get Mr.

20   Ganim's records and I used his cell phone and his IP

21   addresses to find out who he was.  Okay.  The cell phone

22   tower records was done by the federal government.

23   Q.  Okay.  So the cell phone information was gathered after

24   your personal participation in the investigation?

25   A.  Yes.

1    Q.   But you did review that?

2    A.   Yes.

3    Q.   Okay.  And do you know who generated or what agency

4    generated or caused the generation of the cell phone

5    records?

6    A.   I believe the FBI.

7    Q.   Okay.  And tell us about the map and what it showed?

8    A.   It showed, I guess points on a map of where cell towers

9    would have been, where his phone, if you know how they ping

10   off of cell towers it showed a direction of travel from his

11   home town through Ohio, through Pennsylvania, down through

12   West Virginia into Preston County and then after their

13   encounter, it showed it going right back the other way.

14   Q.   Did you review any of the chats from Kik Messenger in

15   the case?

16   A.   Yes.

17   Q.   Okay.  And tell us generally what the chats indicated?

18   A.   To me it was Mr. Ganim grooming the juvenile for a

19   possible sexual encounter.  There was very explicit sexual

20   conta--sexual verbiage in the chats.  There was pictures

21   transferred back and forth in the chats.

22   Q.   What kind of pictures?

23   A.   There was a picture of his penis.  There was pictures of

24   the juvenile.

25   Q.   Were the pictures of the juvenile, were any of them

1    pornographic?

2    A.   There--

3    Q.   Sexually suggestive?

4    A.   Yes.

5    Q.   Okay.  Now did you review any of the chats that took

6    place after the alleged encounter on October 1st in Preston

7    County?

8    A.   Yes, I did.

9    Q.   Okay.  Did they have any investigative value?

10   A.   The--excuse my wording but the gist of it was that I

11   believe the juvenile had mentioned something about being a

12   virgin and then she said, well, part of me still is and Mr.

13   Ganim agreed with that.

14   Q.   Okay.  Can you tell us in a little more detail how you

15   interpret that or what that meant?

16   A.   Apparently--what I gathered out of that is that they did

17   have anal sex.  She--she wasn't vaginally penetrated; she

18   was anally penetrated.

19   Q.   Was there a discussion about that in the chats?

20   A.   Not--

21   Q.   Some reference to it in the chats?

22   A.   Not in so many words; no, sir.

23   Q.   Okay.  Well was there an indication in the chats that

24   any kind of contact had occurred or that there was this

25   meeting?

1   A.   Yes.

2   Q.   And did you use the chats to corroborate the other

3   information in the case?

4   A.   Yes.

5   Q.   And was there anything in the chats from after the

6   encounter that suggested or indicated that some type of

7   sexual activity had occurred on October 1st?

8   A.   Yes.

9   Q.   Okay.  How did you cause the interview of the victim to

10  occur?

11  A.   I contacted the mother and the father after the

12  information that I had found out from the analysis of her I-

13  Pod, explained to them what I had found and asked them if it

14  would be okay to interview her.

15  Q.   What happened?

16  A.   I--they okayed it.

17  Q.   And how did the victim get to your office for that

18  interview?

19  A.   Either the mother or the father brought her.

20  Q.   Okay.  And where did the interview take place?

21  A.   In my office.

22  Q.   All right.  Now did you have any con--of course there's

23  a recording of that interview?

24  A.   Yes.

25  Q.   A video?

Sinclair - Cross                                              53

1    A.   Yes.

2    Q.   All right.  Is that your common practice?

3    A.   Yes.

4    Q.   All right.  Were there any conversations that took place

5    before that video or did you just kind of let it roll when

6    she came in?

7    A.   Yeah.  As soon as she came in, basically I told the

8    parents and her what I was going to do.  Basically, I want

9    to record this; you know, say who I am, who--then I'll ask

10   you who you are and all that; nothing about the act.

11   Q.   Nothing substantive?

12   A.   No.

13   Q.   Okay.  Okay.  Because sometimes, as you know, there's a

14   pre-interview--

15   A.   Right.

16   Q.   --before the actual interview.

17   A.   Right.  Yeah.

18   Q.   And that didn't occur here?

19   A.   No.

20   Q.   All right.  That's your practice?

21   A.   Yes.

22   Q.   To record everything that's said?

23   A.   Yes.

24   Q.   All right.  Now was the victim in any kind of distress

25   when she came to your office or during the interview?

Sinclair - Cross                    54

1    A.  She didn't appear to be, no.

2    Q.  All right.  And how did you get the I-Pod in the first

3    place?  How did--how did this investigation come to your

4    attention?  Did you seek it out or did someone--or did it

5    come to you?

6    A.  It came to our department.

7    Q.  Describe how.

8    A.  I believe the sister of the juvenile had noticed that

9    there was pictures, pornographic pictures on her sister's I-

10   Pod.

11   Q.  Okay.

12   A.  Took it to the dad.  The dad contacted the mother.  The

13   mother contacted our office, which was Deputy Meador and

14   Deputy Meador then gave it to me to do the analysis.

15   Q.  Now earlier in your testimony there was a suggestion

16   that the sexual activity was compelled.  Can you describe

17   that?  Are we talking about any threats or force or anything

18   like that in this case?

19   A.  Not that I--no.

20   Q.  Okay.

21   A.  No.

22   Q.  You can't have consensual sex with a minor because a

23   minor can't consent, right?

24   A.  Correct.

25   Q.  But it was, from an outward appearance, a consensual

Sinclair - Cross                                    55

1    activity?

2    A.   Yeah.   Yeah.

3    Q.   The victim knew the meeting was going to happen--

4    A.   Yes.   Yes.

5    Q.   --knew that Mr. Ganim would be in town--

6    A.   Yes.

7    Q.   --and wanted to go meet with him?

8    A.   Correct.

9    Q.   And get together there?

10   A.   Correct.

11   Q.   All right.  And she never alleged that he threatened her

12   or scared her or harmed her or anything like that?

13   A.   There was no threat of bodily harm or anything.

14   Q.   Okay.  And in fact the relationship, if you want to call

15   it that, continued for some--some time as evidenced by the

16   Kik Messenger?

17   A.   Correct.

18   Q.   All right.  How do you know where--how do you know that

19   Mr. Ganim, as you testified, resided in Ohio?  Where did you

20   get that information from?

21   A.   I--when I got the information back from Kik it was

22   lengthy.  It was probably forty or fifty pages.  I went

23   through every IP address and I wrote down every IP address

24   and where I had a larger conglomerate of the IP address area

25   I knew it was in the Ohio area.  I knew it was around the

1    Bainbridge area and then when I got my information back from

2    IACIS it proved what I had wrote down that he lived in the

3    Ohio area.

4    Q.  Okay.  So did you subpoena the information from Kik

5    first?

6    A.  Yes, I did.

7    Q.  All right.  And what did you actually request in the

8    subpoena?

9    A.  Any and all records of Patrick Ganim.

10   Q.  Of Patrick Ganim or of the--the term that he went by

11   through Kik?

12   A.  Yeah, his screen name.

13   Q.  His screen name?

14   A.  Yes.

15   Q.  Okay.  And then that information--what did it tell you

16   when you received the materials back?  What did it actually

17   tell you about that screen name?  Did it give you an address

18   and a telephone number and a home location for Ganim or did

19   it--or--what--what was it all about?

20   A.  It was more or less--it was a list of pages--page after

21   page of IP addresses.

22   Q.  Is that because it's a mobile--we're talking about a

23   mobile device?

24   A.  Yes.

25   Q.  If it was a fixed device then you would have one IP

Sinclair - Cross                                    57

1    address?

2    A.   If he used it at that one address, yes.

3    Q.   Okay.  And what more did you learn from IACIS, is it?

4    A.   Yes.

5    Q.   What more did you learn there?  How did--how did that

6    help you focus in your--

7    A.   What they sent to me was a picture of Mr. Ganim's

8    Facebook and a search report of Mr. Ganim; gave me his name,

9    his date of birth, his address, social, who he worked for,

10   where he worked and where he lived.

11   Q.   And was that based on the information from the Kik

12   Messenger or was that based on the IP addresses that you--

13   you already had?

14   A.   Kik Messenger and the IP addresses both.

15   Q.   So you able to match up information when you receive--

16   A.   Correct.

17   Q.   Were any devices located in Ohio that matched the IP

18   address that you had identified?

19   A.   I believe the Bainbridge Township Police Department

20   served the search warrant.  They confiscated computers and

21   cell phones.

22   Q.   And did they ever relate--explain to you that there was

23   some type of corroboration or something from the search that

24   indicated that this was the right individual and that this

25   should continue as an investigation?

Sinclair - Cross                                          58

1   A.   I did not receive any report from them, other--

2   Q.   What did you learn?

3   A.   Learned that it was--basically it was Mr. Ganim and he

4   was using his cell phone as the means of communication.

5   Q.   So the device was ident--a device was identified?

6   A.   Yes, sir.

7   Q.   All right.  And was there any analysis of that device

8   that occurred?

9   A.   That I cannot tell you.

10  Q.   Would that be through the FBI?

11  A.   Either FBI or Bainbridge.

12           MR. WALKER:  Okay.  I have no further questions.

13           THE COURT:  Thank you.  Any redirect?

14           MS. MONTORO:  No, Your Honor.

15           THE COURT:  Thank you.  You may step down, sir.

16      (Witness excused from stand)

17           THE COURT:  Any further witnesses, Ms. Montoro?

18           MS. MONTORO:  No, Your Honor.

19           THE COURT:  Mr. Ganim, I take it you were able to

20  follow the testimony of the officer?

21           THE DEFENDANT:  Yes, sir.

22           THE COURT:  Do you need any additional time with

23  Mr. Walker before I entertain your plea, sir?

24           THE DEFENDANT:  No, sir.

25           THE COURT:  Patrick W. Ganim, how do you plead to

1    Count One of the Indictment, which charges you with

2    felonious travel with intent to engage in illicit sexual

3    conduct on or about October 1, 2014 in Preston County, West

4    Virginia, in the Northern District of West Virginia, and

5    elsewhere?

6       (Pause)

7          THE DEFENDANT:  Guilty.

8          THE COURT:  Is that your own free, voluntary,

9    knowing, intelligent, un-coerced plea of guilty to that

10    felony charge?

11          THE DEFENDANT:  Yes.

12          THE COURT:  You indicated you heard the testimony

13    of the officer.  Is there anything about your conduct on or

14    about October 1, 2014 that he described in that testimony

15    that you disagree with?

16          THE DEFENDANT:  No, sir.

17          THE COURT:  Mr. Walker, does your client desire to

18    make any statements at this time?

19       (Pause - Counsel and Defendant conferring)

20          MR. WALKER:  He'll make a statement at sentencing.

21          THE COURT:  Very good, sir.  The Court will enter

22    an appropriate Report and Recommendation.  Within that

23    Report and Recommendation I will outline the various things

24    that I'm required to under Rule 11 and the--make appropriate

25    findings based upon the testimony that's been given here

60

1    today.  I will recommend acceptance of the plea of guilty

2    and recommend that Mr. Ganim be adjudicated guilty by the

3    District Judge; that sentencing proceed.  To that end I'll--

4    I'll direct that a Presentence Investigation Report be

5    prepared.  I think that concludes today's proceeding.  Is

6    there anything else from the Government?

7            MS. MONTORO:  No, Your Honor.

8            THE COURT:  How about you, Mr. Walker?

9            MR. WALKER:  No.

10           THE COURT:  Good luck to you, Mr. Ganim.  We're in

11   recess.

12        (The hearing concluded at 2:17 p.m., 06-08-2015)

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, Linda L. Bachman, Certified Verbatim Reporter and Official Reporter of the United States District Court for the Northern District of West Virginia, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the above-styled action as digitally recorded and typographically transcribed by my.

I certify that the transcript fees and format comply with those prescribed by the Court and the judicial Conference of the United States.

Given under my hand this 13th day of January, 2016.


___/s/ Linda L. Bachman_____
Official Reporter, United States
District Court for the Northern
District of West Virginia